# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 13 2016, 6:16 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Deborah Markisohn
Marion County Public Defender
Agency, Appellate Division
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Andrew Kobe
Justin F. Roebel
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| T.G.,<br>*Appellant-Respondent,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Petitioner* | October 13, 2016<br><br>Court of Appeals Case No.<br>49A02-1603-JV-492<br><br>Appeal from the Marion Superior Court, Juvenile Division<br><br>The Honorable Marilyn A. Moores, Judge<br><br>The Honorable Scott B. Stowers, Magistrate<br><br>Trial Court Cause No.<br>49D09-1512-JD-2281 |

**Mathias, Judge.**

The juvenile division of the Marion Superior Court determined that T.G. was a delinquent child for committing what would be Level 4 felony child molesting if committed by an adult and Class A misdemeanor indecent display by a youth. The court also placed T.G. in an inpatient sex offender treatment program. On appeal, T.G. claims that the trial court abused its discretion in placing him in the inpatient treatment program because a less restrictive placement was available.

We affirm.

## Facts and Procedural History

At the time relevant to this appeal, T.G. was a sixteen-year-old boy living with his mother ("Mother"), father, and his eight-year-old brother ("Brother"). T.G. suffered from depression and attempted to commit suicide by taking an overdose of prescription medication. As a result of this suicide attempt, T.G. was placed in a hospital stress center, where he met L.R., a fifteen-year-old girl. T.G. and L.R. attended the same high school and began to date after they were released from the hospital.

T.G. and L.R.'s relationship became sexual, and the two engaged in "rough" sex, including T.G. choking L.R. T.G. also recorded video of the two having sex. On three different occasions, T.G.'s aunt drove him to L.R.'s house, where he would sneak inside and have sex with L.R. T.G. sent L.R. pornographic videos. T.G. also told L.R. that he had sex with his male best friend.

When L.R. told T.G. that she wanted to end their relationship, he stated that if she did so, he would post the recordings of their sexual acts to the Internet. L.R. became upset with T.G. when he told her that he had cheated on her, and T.G. threatened to kill himself by drinking bleach and disinfectant if she did not forgive him.

L.R. eventually did end her relationship with T.G. Sometime thereafter, L.R. received a message on her phone from another girl claiming that T.G. had cheated on her too, showing a screenshot of a sex video depicting L.R. and T.G. L.R. then received a video from the other girl showing T.G. performing oral sex on his eight-year-old Brother's buttocks and anal area. L.R. was horrified by this video and showed it to her mother and step-father, who contacted the police.

On December 14, 2015, the State filed a petition alleging that T.G. was a delinquent child for committing acts that, if committed by an adult, would be two counts of child molestation, one count of child exploitation, and one count of possession of child pornography. The State later added another allegation that T.G. committed additional acts that would be child molesting if committed by an adult and two counts of indecent display by a youth.

On January 8, 2016, T.G. entered into an agreement with the State in which he admitted that he had committed acts that would be one count of child molesting if committed by an adult and one count of indecent display by a

youth. T.G. admitted to the acts underlying these allegations before the trial court, and the trial court set the matter for a dispositional hearing.

[9] Prior to the dispositional hearing, the trial court received a sex offender evaluation of T.G. performed by Jennifer Meese at Centerpointe. This evaluation determined that T.G. was at a high risk to repeat his sexual behavior and a moderate risk to repeat his delinquent behavior. This report recommended that T.G. be placed in a residential treatment program.

[10] After this evaluation was completed, the trial court requested another evaluation be performed on T.G. by child psychologist Dr. Jim Dalton ("Dr. Dalton"). Dr. Dalton's evaluation put T.G. at a low to moderate risk for causing sexual harm to a younger person and at a low to moderate risk for acting in a delinquent manner. Dr. Dalton recommended T.G. undergo outpatient treatment while living with his aunt and thought residential treatment was unwarranted.

[11] The Probation Department submitted to the court a predispositional report recommending that T.G. be placed on formal probation and released to the custody of his aunt, undergo outpatient sex offender therapy, have no contact with Brother, and have no unsupervised access to social media or a mobile phone. This predispositional report also indicated that Mother was minimizing T.G.'s behavior toward Brother and placing most of the blame on L.R.

[12] A two-day dispositional hearing began on February 24, 2016. The court heard evidence from L.R., L.R.'s mother and step-father, T.G.'s mother and aunt,

and several service providers, including Dr. Dalton. At the conclusion of the hearing, on February 25, 2016, the trial court stated:

> Obviously, this is more complex than most cases. There's a lot going on here. There's the CHINS matter that's sort of semi related to this and we have kind of dual[ing] sex offender evaluations. The CHINS Court sort of deferred to the delinquency Court, which makes sense under the facts of this case and we have two sex offender evaluations that reach different conclusions. So, I have to decide based on that information what's in your best interest as well as the communit[y]'s best interest. I can tell you that in thirteen years of doing this, I don't know if I recall a more INAUDIBLE case than this. Court will proceed to Disposition and incorporate the Pre-Dispositional Report. As a finding of the Court, Court will award wardship to the Department of Correction, suspend that. As a condition of your Probation Suspended Commitment, I will order inpatient sex offender treatment at Resolute paid for by the Department of Child Services. No contact with [L.R.]. No contact with [Brother]. The agreement calls for the no contact order for [Brother] to be modified or terminated upon order of Court, so that will be an order as well. No unsupervised access to internet, television or cell phone use. Delete all social media accounts. No access to social media. Also, put in the order that prior to discharge whenever that is, also complete another ERASER evaluation as well as a new safety plan and put that in place for the Court to consider relative care at that point that will need to happen. Alright, [T.G.], Suspended Commitment, serious business. Do not violate. . . .

Tr. pp. 138-39. Also on February 25, the trial court entered a written delinquency dispositional order incorporating these terms. The following day, T.G. filed a motion to reconsider, which the trial court denied that same day. T.G. then filed a notice of appeal on March 9, 2016, and this appeal ensued.

## Standard of Review

[13] When reviewing a juvenile delinquency adjudication, we will consider only the evidence and reasonable inferences supporting the trial court's judgment. *B.R. v. State*, 823 N.E.2d 301, 306 (Ind. Ct. App. 2005). We neither reweigh the evidence nor judge witness credibility. *Id.*

[14] Dispositional decrees in juvenile delinquency cases are governed by Indiana Code section 31-37-18-6, which provides:

> If consistent with the safety of the community and the best interest of the child, the juvenile court shall enter a dispositional decree that:
>
> (1) is:
>
>   (A) in the least restrictive (most family like) and most appropriate setting available; and
>
>   (B) close to the parents' home, consistent with the best interest and special needs of the child;
>
> (2) least interferes with family autonomy;
>
> (3) is least disruptive of family life;
>
> (4) imposes the least restraint on the freedom of the child and the child's parent, guardian, or custodian; and
>
> (5) provides a reasonable opportunity for participation by the child's parent, guardian, or custodian.

[15] The choice of the specific disposition for a juvenile determined to be delinquent is a matter within the sound discretion of the trial court and will not be reversed absent an abuse of that discretion. *J.S. v. State*, 881 N.E.2d 26, 28 (Ind. Ct. App.

2008). The trial court's discretion is subject to the statutory considerations of the welfare of the child, the safety of the community, and the policy of favoring the least harsh disposition. *Id*. Even if options less harsh than commitment to an institution are available to the juvenile court, there are still times when commitment to a suitable public institution is in the best interest of the juvenile and of society. *D.S. v. State*, 829 N.E.2d 1081, 1085 (Ind. Ct. App. 2005). In other words, the law requires only that the disposition selected be the least restrictive disposition that is consistent with the safety of the community and the best interest of the child. *Id*. Thus, the trial court is accorded wide latitude and great flexibility in its dealings with juveniles. *J.S.*, 881 at 28. It is with this deferential standard in mind that we review the trial court's decision.

## Discussion and Decision

[16] T.G. argues that the trial court abused its discretion by ordering him to undergo inpatient treatment when a less restrictive, community-based option was available. T.G first notes that there was evidence that placement with his aunt would be appropriate. Specifically, the Department of Child Services ("DCS") had approved a safety plan for T.G. to be placed with his aunt, and the Probation Department's report also approved of T.G. being placed with his aunt. He also contends that ordering him to have no contact with L.R. and Brother would sufficiently safeguard the community.

[17] T.G. also claims that inpatient therapy was not in his best interests because his guardian *ad litem* ("GAL") testified that placement with his aunt was in T.G.'s best interests and that placement in inpatient therapy might expose him to

negative influences; Dr. Dalton's evaluation was more thorough than the initial evaluation and concluded that T.G. was at only a low to moderate risk of reoffending; and Dr. Dalton's report also recommended outpatient therapy. T.G. argues that outpatient therapy was the least harsh disposition, given the recommendations for outpatient therapy by Dr. Dalton, the GAL, and the Probation Department.

[18] If this had been the only evidence before the trial court, we might agree with T.G. that the court's dispositional order constituted an abuse of discretion. However, the evidence relied upon by T.G. is almost exclusively evidence that does *not* favor the decision of the trial court, which we may not consider on appeal. *See B.R.*, 823 N.E.2d at 306.

[19] The evidence that favors the trial court's decision demonstrates that T.G. committed a serious and disturbing sex crime against his much younger brother. He also engaged in "rough" sex acts with L.R. at a relatively young age. L.R. also testified that T.G. also had a penchant for pornography. He threatened to post to the Internet video of the recorded sexual activity between himself and L.R., and he did send the video to a third party and to L.R.'s mother. He also sent video of his sexual abuse of his eight-year-old brother to a

third party.[1] L.R. also testified regarding T.G.'s knowledge of how to manipulate his therapists while in the hospital stress center.

[20] In addition to L.R.'s testimony, the initial sex offender evaluation conducted by Jennifer Meese at Centerpointe concluded that T.G. was at a high risk to repeat his sexual behavior and a moderate risk to repeat his delinquent behavior. This initial report also recommended that T.G. be placed in a residential treatment program. On appeal, T.G. attempts to attack the credibility of this report and argues that Dr. Dalton's report should have been given more weight. However, this is simply a request that we reweigh the evidence, which we may not do on appeal.

[21] The same is true with regard to T.G.'s claim that placement with his aunt was more appropriate. Although there was evidence to support a decision to place T.G. with his aunt, there was also evidence before the court that, despite its recommendation, DCS still had "concerns" about releasing T.G. to his aunt. Tr. p. 121. L.R. also testified that it was T.G.'s aunt who facilitated their sexual encounters by driving T.G. to L.R.'s home. Although T.G.'s aunt denied this, we are not at liberty to second-guess the trial court's determinations of credibility. Moreover, T.G.'s aunt testified that she worked daily until 3:30 p.m. and that T.G. planned to attend an evening high school that did not start until

---

[1] Some evidence indicated that T.G. had been manipulated or threatened by another person online to perform these acts on Brother. However, the trial court was not required to credit this uncorroborated claim.

3:45 p.m. Thus, it appears that T.G. would have been by himself, unsupervised, for a large period of time had he been placed with his aunt.

[22] This is an admittedly close case, and some evidence in the record would have supported a decision to place T.G. with his aunt and have him undergo outpatient therapy. Indeed, had we been in the trial court's position as the trier of fact, we might have come to a different conclusion. However, on appeal we must apply our deferential standard of review. Applying this standard, we can only conclude that the trial court did not abuse its significant discretion when it determined that the least restrictive disposition that was consistent with the safety of the community and in the best interests of T.G. was to order T.G. to undergo inpatient residential treatment. We therefore affirm the order of the trial court.

[23] Affirmed.

Robb, J., and Brown, J., concur.